1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>CLINTON MACK REID,<br><br>            Defendant. | Case No. 15-cr-1349-BAS<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**<br><br>**[ECF No. 24]** |

   The officers in this case approached a large gathering of African-American families, many of whom were clearly affiliated with the violent Emerald Hills Blood gang, but who were apparently picnicking and celebrating Easter Sunday. Officers planned to watch and see if any of the individuals moved away from the officers, apparently believing avoidance of the police officers provided reasonable suspicion to detain the avoiders. Officers hoped those detained would be on a felony "Fourth waiver," allowing them to conduct a probation search, so they could see if any of the gang members possessed anything illegal. Their technique worked: Defendant Clinton Mack Reid moved away from the officers. They detained him, and he was,

in fact, on probation, so they conducted a "Fourth waiver" search and found a loaded gun.

Although the Court sympathizes with law enforcement's attempts to control violent gang activities, this does not comport with the Fourth Amendment.

I.  BACKGROUND

Emerald Hills Community Park, also known as Kelton Park ("the Park"), is a main hangout for the Emerald Hills Blood gang.  It is an area with frequent reports of violence, drug trafficking, and gang activity.  San Diego police officers in the Gang Suppression Unit ("GSU") had been debriefed that Easter Sunday was "claimed" as a gang holiday by the Emerald Hills Blood gang.[1]

On Easter Sunday, April 5, 2015, officers with the SDPD GSU arrived at the Park to check out 911 reports of fighting and marijuana smoking by African-American adults at the Park.  The 911 calls did not provide any description of the offenders other than the fact that they were African American.  There were no reports of weapons.  When they arrived at the Park, officers noticed over 100 people, mostly African Americans, including families and children, picnicking and listening to music.  Many were wearing the red and gray Emerald Hills Blood colors.  Officers did not see any fighting or drug use.

Officers set up around the Park and planned to watch as a marked patrol car arrived at the Park to see if any individuals tried to leave the Park to avoid the officers. That way, Sgt. Spurlock said in the radio transmission to his fellow officers, officers might be able to "pick some people off" or "rustle some people up" as they left the Park.

As Sgt. Spurlock pulled into the parking lot near the main entrance to the Park in a marked patrol car, he heard a fellow officer report that two African-American

---

[1] The Emerald Hills Bloods began as the Bunny Boys car gang, hence the affinity with bunnies and Easter.

men, one of whom later proved to be Mr. Reid,[2] were walking quickly away from the police car. The officer reported that Mr. Reid appeared to be the "most nervous of the group." Sgt. Spurlock saw him walking downhill and followed as he left the Park, approached a four-door Acura, and briefly sat in the backseat. Sgt. Spurlock saw Mr. Reid make a gesture from his body to the floor of the car. Sgt. Spurlock believed he was "dumping" something into the car, but could not see if Mr. Reid actually had anything in his hands. At the time, Sgt. Spurlock said he "would not be surprised" if Mr. Reid had unloaded a gun into the car. Sgt. Spurlock watched as Mr. Reid then walked back toward the Park.

Believing he had reasonable suspicion to ask Mr. Reid what he might have left in the car, Sgt. Spurlock had Officer Burgess detain him. Officer Burgess handcuffed Mr. Reid for officer safety and brought him over to the curb where he had him sit down, while Officer Brou ran the license plate on the car. Mr. Reid was cooperative and gave his name to the officer, which matched the name on the car registration, but Mr. Reid denied the car was his. He also denied putting anything into the car. Officers looking into the Acura through the car window believed they saw something bulging in the rear seat pocket of the car.

In response to the officers' questions, Mr. Reid admitted he was on probation. Officer Brou confirmed through a records check that Mr. Reid was, in fact, on probation, and that as a condition of his probation, he had a "Fourth waiver."

Believing this allowed them to search Mr. Reid, officers searched Mr. Reid's person and found the car keys to the Acura. They then searched the Acura, and the back pocket proved to have a loaded Glock-40 with one bullet in the chamber ready to fire.

Mr. Reid was arrested and charged with being a felon in possession of a firearm. He brings this motion to suppress the gun claiming that: (1) he was illegally

---

[2] As an aside, the other individual proved to be Aaron Campbell, who was shot at the Park later in the day after Mr. Reid's arrest.

detained; (2) the illegal detention tainted the search that arose therefrom; and (3) he and his car were searched without a warrant or other reason justifying the search.

## II. DISCUSSION

### A. Reasonable Suspicion

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion" is not a particularly high threshold to meet. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013). The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. *Wardlow*, 528 U.S. at 123. The court must consider the totality of the circumstances, including the "collective knowledge of the officers involved and the inferences reached by experienced, trained officers." *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992).

Nervousness, in a high-crime area, without more, is not sufficient to establish reasonable suspicion to detain an individual. *Moreno v. Baca*, 431 F.3d 633, 642 (9th Cir. 2005). Although "in some circumstances an individual's flight from law enforcement in a high crime area can justify an investigatory seizure[,]" but a suspect's "simple act of walking away from the officers" is not the equivalent of flight. *Id.* at 643; *see also Washington v. Lambert*, 98 F.3d 1181, 1192 (9th Cir. 1996) ("[M]any innocent black men, and even many innocent white men, will appear nervous when they notice that they are being followed by the police." ); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even if in a high crime area, but it is a factor that can be considered in the totality of the circumstances.").

//

The fact that an individual is a member of a gang that has a tendency to carry weapons "does not lead reasonably to any inference as to whether a gang member was armed on a given occasion." *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999). "Membership in an organization does not reasonably lead to any inference as to the conduct of a member on a given occasion." *Id.* (internal quotation marks omitted).

In this case, the Government relies on several factors to argue officers had reasonable suspicion to detain Mr. Reid: (1) They received reports of fighting and marijuana smoking in the area; (2) This was a gang holiday for a gang that was known for violent, criminal behavior, and Mr. Reid was dressed in gang colors in the Park full of gang members; (3) When they arrived at the Park, Mr. Reid, who appeared nervous, and his companion walked quickly away from officers; and (4) Mr. Reid got into the back of a car and may have put something illegal into the back of the car. The Court cannot find this is sufficient reasonable suspicion to detain Mr. Reid.

First, reports of fighting and marijuana smoking were at least 25 minutes before officers arrived at the Park. There were over 100 individuals, mostly African Americans thus matching the description of those fighting, in the Park at the time officers arrived. They did not see (or smell) any fighting or marijuana smoking. They had absolutely no reason to believe that Mr. Reid, out of the 100 or so individuals in the Park, was someone involved in fighting at the Park. In fact, officers only saw picnickers, families, music playing—all legitimate activities.

That said, Mr. Reid was clearly wearing gang clothing.[3] But again, simply wearing gang colors is not enough to warrant reasonable suspicion justifying a stop even if the gang is one known for violent behavior. Membership in a violent gang does not lead to the inference that an individual is engaging in violent behavior on a given occasion. *See Spivey*, 194 F.3d at 978.

---

[3] Despite counsel's suggestion that any color could be gang-related, this was Emerald Hills Blood territory, where red and gray are the adopted colors, and Mr. Reid had two bandanas—one red and one gray—hanging out of his back pocket. There is no real doubt that Mr. Reid was wearing gang colors.

Officers add that Mr. Reid walked away quickly when they arrived. The Court cannot say, in today's highly charged climate, that an African American who walks away from police in what appears to be an attempt to avoid police contact, is reasonably suspicious. There was no evidence of flight. Mr. Reid was not told by police to stop and then sprinted away or ignored the command. Mr. Reid just appeared to be someone who walked briskly away from officers when they arrived at a public park. He even returned to the park despite the police presence. This does not rise to the level of reasonable suspicion. *See Moreno*, 431 F.3d at 643 (the simple act of walking away from a police officer in a high crime area does not provide reasonable suspicion for a detention).

Finally, the Government argues that Sgt. Spurlock believed Mr. Reid had "dumped" something in the back of his car. In fact, Sgt. Spurlock saw Mr. Reid get into the back of the car briefly and then return toward the park. Sgt. Spurlock could not say with any certainty whether Mr. Reid had even put anything into the back of the car. At the scene he said he "would not be surprised" if Mr. Reid had unloaded a gun. A mere hunch that someone may have done something illegal is insufficient to provide reasonable suspicion for a stop. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (an officer may not rely on a "mere hunch" to justify a stop.)

Considering that there were reports of fights, none of which could be directly tied to Mr. Reid; Mr. Reid was wearing gang clothing; Mr. Reid walked rapidly away when the patrol car pulled into the Park, which was a high crime area; and Mr. Reid got briefly into the back of the car, and may have placed something into the back of the car while he was there, the Court cannot find that the totality of circumstances provides reasonable suspicion for the stop and detention of Mr. Reid in this case.

The fact that Mr. Reid was on probation and subject to a Fourth waiver is irrelevant, since officers did not know this fact at the time they detained him. *See Moreno*, 431 F.3d at 639 (the court must make an evaluation of reasonableness of the officer's actions in light of the facts and circumstances then known to the officer).

### B. Automobile Exception

The Government argues that, even if officers did not have reasonable suspicion to stop Mr. Reid, the automobile exception entitled them to search his car.

The "automobile exception" provides an exception to the warrant requirement if officers have probable cause to believe that the automobile contains evidence of a crime and the vehicle is readily mobile. *See United States v. Ewing*, 638 F.3d 1226, 1231 (9th Cir. 2011). An officer has "probable cause" when, under all the circumstances, "there is a fair probability that contraband or evidence" or a crime will be found in the location. *Id.*

Since officers failed to have reasonable suspicion to stop and question Mr. Reid, the Court fails to see how they nonetheless had probable cause to search his car. As discussed above, the fact that Mr. Reid was dressed in gang clothing, walked away from the officers, and "may" have put something in the back of his car, did not give the officers probable cause to believe that his car contained evidence of a crime. Thus, the Government's reliance on the automobile exception must fail.

### C. Fruit of the Poisonous Tree[4]

Defense argues that the illegal investigatory stop of Mr. Reid led the officers to determine: (1) Mr. Reid's identity; (2) the fact that Mr. Reid was on probation and subject to a Fourth waiver; and (3) the fact that he had the car keys in his pocket. These factors then led to the search of the car and discovery of the gun, thus, the defense argues, the gun must be suppressed as "fruit of the poisonous tree."

"The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of government misconduct to evidence derived from the illegal conduct or 'fruit of the poisonous

---

[4] Although the United States does not argue that the "fruit of the poisonous tree" doctrine does not extend to the gun found in this case, in a footnote, they argue that the gun would have been inevitably discovered. Hence, the Court finds it prudent to analyze this exception.

tree.'" *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1395 (9th Cir. 1989). However, such extension of "[t]he exclusionary rule requires a causal connection between the illegal conduct and the evidence sought to be suppressed." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc). Evidence obtained by an illegal investigatory stop is "fruit of the poisonous tree" warranting application of the exclusionary rule if "granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Thus, "the Supreme Court has developed three exceptions to the 'fruit of the poisonous tree' doctrine . . . the 'independent source' exception, the 'attenuated basis' exception and the 'inevitable discovery' exception." *Ramirez-Sandoval*, 872 F.2d at 1396. Although these are three separate exceptions, they are closely linked. *Id.* at 1397. They each converge to a certain extent "as in each case, the core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred." *Id.* (internal quotation marks and alteration omitted).

In order to rely on the inevitable-discovery exception, the Government must prove, by a preponderance of the evidence, that "by following routine procedures, the police would inevitably have uncovered the evidence." *Ramirez-Sandoval*, 872 F.2d at 1399. The Government argues that, had the officers not stopped Mr. Reid, they would still have run the car license plates, found out the registered owner of the car was an individual subject to a Fourth waiver, and searched the car. Unlike an inventory search incident to an arrest, however, this requires a great deal of speculation as to what police officers would or would not have done in a particular situation.

Following the evidentiary hearing, the Court cannot find that the Government meets its burden of proving that the gun would inevitably have been discovered had Mr. Reid not been stopped, volunteered that he was on probation, volunteered his

1  name, and had the keys to the vehicle not been discovered on his person.  Therefore,
2  the gun must be suppressed as the fruit of an illegal detention.

## III.  CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS** Defendant's motion to suppress evidence.  (ECF No. 24.)  The Court also **GRANTS** the parties' motions to shorten time to file their respective briefs (ECF Nos. 25, 33, 35), and Defendant's motion for leave to file a reply brief to the Government opposition (ECF No. 37).

**IT IS SO ORDERED.**

**DATED: November 10, 2015**

Hon. Cynthia Bashant
United States District Judge